**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, SS.**

**TRIAL COURT
SUPERIOR COURT
DEPARTMENT
BUSINESS LITIGATION
SESSION**

| | |
|---|---|
| INCIPIENT, INC.,       ) <br>        ) <br>       Plaintiff,     ) <br>        ) <br> v.              ) <br>        ) <br> INTERNATIONAL BUSINESS MACHINES )<br> CORPORATION,      ) <br>        ) <br>       Defendant.    ) <br>        ) | CIVIL ACTION NO. |

**COMPLAINT**

Introduction

1.     Plaintiff Incipient, Inc. ("Incipient") seeks damages for improper termination of a product-development and distribution contract and other misconduct by Defendant International Business Machines Corporation ("IBM"). IBM has failed to pay Incipient a contractually required termination fee estimated at $20,744,200 due as a result of IBM's unilateral and unwarranted decision to terminate the development of a network storage virtualization software product. IBM also has breached its duties of good faith and fair dealing toward Incipient. In addition, Incipient seeks treble damages and attorneys' fees for IBM's overall unfair and deceptive trade practices.

Parties

2.     Incipient is incorporated under the laws of Delaware and has its principal place of business in Waltham, Massachusetts.

USIDOCS 6593200v3

3.     IBM is incorporated under the laws of New York and has its principal place of business in New York.

Jurisdiction and Venue

4.     On information and belief, IBM regularly transacts business in Massachusetts and is therefore subject to this Court's general jurisdiction.  In addition, this Court has jurisdiction over IBM as a result of IBM's actions in Massachusetts in connection with the matters at issue in this case.

5.     Venue is proper in this Court pursuant to Administrative Directive No. 03-1 Superior Court Business Litigation Session Extension and Expanded Venue.

Facts

6.     Incipient is a small, privately-held Massachusetts company that concentrates on the development of software for network storage infrastructure.  IBM is a multinational corporation with 2007 revenues in excess of $98 billion, 2007 net income of more than $10 billion, cash in excess of $16.1 billion as of December 31, 2007, approximately 386,000 employees worldwide, and assets in excess of $120 billion as of December 31, 2007.  Among many other things, IBM also manufactures and markets network storage products, which are designed to facilitate the movement, management, and protection of stored data.  Within the market of network storage products, therefore, Incipient and IBM are competitors.

7.     Beginning in 2003, IBM sold a network storage software product called the SAN[1] Volume Controller ("SVC").  SVC is an internally-developed IBM product.

8.     In late January 2004, IBM expressed interest in a new storage virtualization software product ("Product") that Incipient was developing.  Virtualization allows companies to

---

[1]     In this context, SAN is an acronym for "storage area network."

manage storage resources of different vendors seamlessly as a single pool (instead of having stored data in separate storage silos), and thus is a new and more efficient way to store data. Incipient's Product represented a technological alternative to IBM's SVC. Whereas IBM's SVC software runs on a PC-like platform with inherent limitations on processing throughput, the Incipient Product runs on a storage switch platform, with higher throughput and processing capabilities. In technical terms, IBM's SVC product is an in-band "appliance-based" technology, whereas Incipient's Product was to deliver a more efficient "switch-based" virtualization technology. Incipient's product was targeted at a higher end customer segment than IBM's SVC product.

9.      In January 2004, IBM was interested in a switch-based storage virtualization product because the storage industry leader, a major competitor of IBM, was known to be developing a switch-based storage virtualization product based on technology similar to Incipient's Product. The competitor's product was to be the first such product released and, if successful, would potentially deliver a significant competitive blow to IBM's storage business. IBM therefore wanted to be ready with a similar product to compete with the competitor's switch-based product when the competitor's product was released.

10.      Incipient and IBM met in January and February 2004 and (at IBM's initiation) in the spring and summer of 2004. At those meetings, the parties engaged in lengthy negotiations of an agreement pursuant to which Incipient would develop the Product, a customized version of a storage networking software product that Incipient was already developing. The Product was to incorporate considerable IBM customization requests and have an "IBM look-and-feel" to it.

11.      Typically, in such a development project, the party performing the development and customization work is compensated for all or a significant portion of the engineering and

development expenses via non-recurring engineering payments ("NRE" payments), or otherwise receives economic consideration for its upfront spending in the form of prepaid or guaranteed royalties. However, during the negotiations with Incipient, IBM sought to limit its upfront financial exposure in the project and refused to make NRE payments or to prepay or guarantee royalties. IBM insisted, as a condition to IBM's entry into the agreement, that Incipient bear most of the development costs and financial risks associated with the Product. These development costs were very substantial for an unprofitable startup company of Incipient's small size. IBM agreed to allow Incipient to recoup its development costs through royalties from IBM if the project proceeded to completion and the Product was introduced to the market and successfully distributed on a global basis by IBM, but IBM also demanded the right to terminate the agreement at any time at its sole discretion. That demand threatened Incipient's potential ability to recover its investment in the project.

12.    Incipient understood that IBM desired a right to terminate the agreement for a variety of reasons, including potential changes in management at IBM, IBM budget issues, concern over how the Product would affect the positioning of IBM's SVC product in the market and, perhaps most importantly, uncertainty about the market for switch-based virtualization products, or simply for then-unforeseen reasons. The parties discussed the possibility that IBM might want to terminate the agreement if IBM's primary competitor did not stimulate significant interest in the market through its expected product launch.

13.    The original version of the parties' contract, which IBM drafted, permitted IBM to terminate the project without cause at any time with no financial consequences to IBM. Because IBM insisted that Incipient bear most of the development costs and that IBM have the absolute right to cancel the project at will—which it had an incentive to do if the market for

- 4 -

switch-based products did not materialize or materialized more slowly than anticipated and IBM

deemed its SVC product sufficient to address demand—Incipient recognized that late

termination by IBM would leave Incipient in a dire financial position.  The dire financial position

would be due principally to the money and effort Incipient expended in developing and

significantly customizing its product for IBM and to the significant amounts Incipient would pay

IBM in 2005 to subsidize test costs incurred by IBM.  (IBM insisted that Incipient pay IBM's

testing costs so as to allow IBM to meet its 2005 budget and spending goals.)

14.    Therefore, Incipient insisted upon negotiating a termination fee payable by IBM,

to be calculated based in part on costs incurred by Incipient as of the time of any termination.  A

major impetus for Incipient's insistence on the termination fee was the possibility that the market

for switch-based virtualization products would not materialize and that IBM would then seek to

terminate the agreement even if Incipient had given IBM no cause to do so.  In addition,

Incipient was concerned that other factors not specific to Incipient—such as the strong internal

IBM bias toward IBM's SVC product; the potential desire by this SVC business unit to

undermine the program with Incipient; and the potential for turnover in executive management in

the IBM storage business unit—might increase the risk of IBM canceling for convenience.  For

these very reasons, the negotiation of the termination fee occupied a substantial portion of the

overall negotiation for the development agreement.

### The Contract

15.    On or about October 15, 2004, nearly simultaneously with IBM's primary

competitor's announcement and public demonstration of a switch-based storage virtualization

product, Incipient and IBM entered into a Licensed Works Agreement, attached hereto as Exhibit

A.  The Product is described in more detail in a document called the Statement of Work

("SOW"), attached hereto as Exhibit B.  Together these documents formed the contract between

- 5 -

the parties ("Contract").  The Contract is governed by New York law.  Licensed Works

Agreement § 15.3.

      16.     Under the Contract, Incipient was to bear the upfront development costs for the

Product.  Further, Section 11.2 of the SOW provided that Incipient, a small, privately held,

unprofitable startup company with no revenues at the time, would subsidize up to 65% of the

costs incurred by IBM during much of 2005, in return for IBM's commitment to launch the

Product on a world-wide basis and devote significant sales and marketing efforts to the Product,

so as to enable Incipient to recoup its multi-million dollar investment in this project via royalties

from IBM.

      17.     Under the Contract, Incipient would retain title to the intellectual property rights

in the Product, while IBM would receive a nonexclusive, world-wide, and nontransferable

license to use, have used, execute, demonstrate, reproduce, display, perform, and distribute the

Product.  See SOW §§ 4.1, 4.5.  IBM also was to receive the exclusive rights to distribute any

versions of the Product containing specific customizations requested by IBM.  See id. § 4.6.

      18.     The Contract allocated product-testing responsibilities between IBM and Incipient

during the development process.  See id. §§ 6.2, 8.0, 8.1.  IBM was specifically obligated to

provide Incipient with access to certain information in IBM's possession necessary for the

development of the Product, to perform certain tests on the Product, and to provide Incipient

with access to IBM's lab facilities during testing.  See id. §§ 6.2, 8.0, 8.1.  IBM was also

required under the Contract to launch the Product and market it actively in a manner similar to

IBM's launch and marketing of SVC.  See id. § 8.0.

- 6 -

19.     The Contract's project schedule set targets for development and testing of the Product and is attached hereto as Exhibit C ("Project Schedule").[2] See id. § 9.0; Project Schedule. The Contract required Incipient to use commercially reasonable efforts to meet the general features and functions set forth in the Product Requirements Document ("PRD") and to use commercially reasonable efforts to meet the project milestones in the Project Schedule. SOW § 6.1. The Contract explicitly provided that the milestones were subject to change. See Project Schedule (setting forth dates for project milestones and providing that "[i]f a Milestone is Delayed, Next Due Date May Require a Corresponding Adjustment for Duration of the Delay").

20.     During the course of the project Incipient and IBM routinely agreed to extensions of the milestones. The parties also amended the PRD and Project Schedule several times, including an amendment effected via a Plan Change Request negotiated in the fall of 2005 and executed on or about January 31, 2006, which is attached hereto as Exhibit D ("Plan Change Request").

21.     Under the amended Project Schedule, Incipient was to deliver the completed Product to IBM in April 2006. The parties understood that the April 2006 target was also subject to change pursuant to the terms of the Contract. The Contract did not provide that time was of the essence for completing the Product or that Incipient would incur financial penalties for delayed performance. The parties recognized that the significant development and customization effort between and among three different companies (namely IBM, Incipient, and the switch platform vendor on which the Incipient software product would operate) across several disparate geographic locations created risks of further delay. The parties also recognized the associated

---

[2]     The SOW contained Attachments A through K. Only Attachment F, the Project Schedule, is appended hereto. The other Attachments have not been appended because of their volume and because they are not necessary to a short and plain statement of the claims.

US1DOCS 6593200v1

high likelihood of timing and product feature/function changes as the development and test process proceeded, given that this project was a first release of a new, complex product. In such situations, frequent product scope reductions are often made to get the first release of the product to market quickly.

22.    The Contract contained detailed and painstakingly-negotiated provisions regarding termination. See supra ¶ 14. Indeed, these provisions were the most heavily negotiated provisions in the Contract. The termination provisions encompass 5 pages in the 21-page SOW. See SOW § 15.

23.    The Contract permitted IBM to terminate it for cause upon written notice to Incipient. See Licensed Works Agreement §§ 14.0-14.3; SOW § 15.3. The Contract defined cause as a party's material breach of the Contract, filing of a bankruptcy petition, or insolvency. Licensed Works Agreement § 14.1. Under the Contract, termination for cause would become effective 30 days from the date of the written notice unless any material breach had been cured. Id. §§ 14.1-14.2; SOW § 15.3.

24.    Prior to November 1, 2004, either party could terminate the Contract without cause and not incur a termination fee. SOW § 15.4. Between November 1, 2004, and January 1, 2005, a termination fee of $750,000 applied to any termination without cause. Id. Between January 2, 2005, and March 1, 2005, the termination fee was $1,500,000. Id.

25.    However, if IBM elected to proceed with the Contract beyond March 1, 2005, Incipient could not terminate the Contract without cause at all, and IBM could only terminate without cause if it paid a higher termination fee to Incipient. The March 1, 2005 "crossover" date was a highly negotiated point in the Contract: it allowed time for IBM to secure necessary internal financial approvals and further assess market demand and need for the Product, with the

- 8 -

parties agreeing that after March 1, 2005, there was "no turning back" (without triggering payment of the higher termination fee by IBM). See SOW § 15.5. After March 1, 2005, the termination fee was to be calculated based on, among other things, the costs that Incipient incurred in developing the product and specific additional development costs imposed on Incipient by IBM. See id; see also supra ¶ 14.

### Incipient Develops The Product

26.     Upon execution of the Contract, Incipient began a massive effort to develop the Product to IBM's specifications, originally expected to require at least 16 months of work. This effort included working closely with IBM staff at IBM's testing facility in Tucson, Arizona, and at other IBM facilities.

27.     IBM subsequently demanded that Incipient make material changes to the Product, including changing the database application used in the Product (in favor of an IBM database that was not well suited for the Product), resulting in material delays in product development. IBM also mandated, without good reason, that Incipient change certain third party software used in the Product, further causing delays and problems. IBM refused to explain the reasons behind the third party software changes to Incipient, despite repeated requests from Incipient.

28.     Incipient incurred costs well in excess of $20 million in developing the Product. By contrast, IBM contributed much less in terms of time and capital to the project. Indeed, as set forth in paragraph 13 above, Incipient was subsidizing most of IBM's testing and program costs during much of 2005.

### IBM Elects Not To Terminate The Contract Prior To March 1, 2005

29.     As of March 1, 2005, IBM elected to continue with the project. Consequently, from that point forward IBM could only terminate the Contract without cause by paying a termination fee calculated pursuant to the Contract.

**IBM's Behavior Delays The Project**

30.    Delays, caused in large part by IBM itself, slowed the development of the Product. IBM delayed development of the Product by, among other things: mandating material changes to the Product; failing to exercise proper program management; requiring the integration of an unstable and defective IBM database software product; requiring Incipient to replace functional third party software used in the Product without explanation (despite repeated requests from Incipient for justification from IBM, which IBM refused to provide); unnecessarily hindering Incipient's personnel in completing their development duties; failing to provide Incipient with the information and access necessary for timely completion of development; failing to staff and manage the test processes in the IBM test facility in Tucson, Arizona properly (partly due to IBM test resources being delayed on testing of the IBM DS 6000 and 8000 product line); and failing to perform the required tests in a timely fashion. In addition to IBM's conduct, the Product's development was also delayed due to other matters beyond Incipient's control, such as the actions of third parties and other factors typical in complex, new development projects of this magnitude.

31.    Incipient repeatedly informed IBM that IBM's conduct and other factors beyond Incipient's control were causing additional delays in development.

**Incipient Pays IBM A Testing Subsidy Under IBM's Threat Of "Draconian Cuts"**

32.    Despite the delays, IBM demanded that Incipient pay it approximately $2 million in late 2005 to subsidize the IBM program and testing costs related to the Product that IBM had incurred in 2005, even though the Contract provided that that testing subsidy was not due until completion of a particularly important phase of IBM's testing known as Integration Verification Testing ("IVT"). As discussed in paragraph 13 above, IBM had insisted that Incipient agree in the Contract to pay the testing subsidy because IBM did not want to incur or record development

- 10 -

costs for the project during 2005. Under the Contract, Incipient was to recoup the approximately $2 million testing subsidy and other development costs through royalties once the Product was released. Incipient had agreed to pay the testing subsidy after completion of IBM's IVT test phase because it believed—on representation by IBM business and legal executives—that, once that phase was complete, IBM would be highly unlikely to terminate the Contract. Indeed, IBM's own representatives repeatedly stated that, after the completion of IVT, "the bullet will have been placed in the chamber of the gun and the trigger of the gun will have been pulled," or words to that effect, meaning that the Product would be certain to be released once testing was finished.

33.    In October 2005, IBM demanded that Incipient pay the approximately $2 million testing subsidy in 2005, even though the IVT phase was not expected to be completed (and the subsidy payment therefore would not have been due) until after January 1, 2006. IBM representatives told Incipient that Incipient had to pay the testing subsidy in 2005 because the money was needed for recording in IBM's year-end financial reporting.

34.    Specifically, at a meeting between the parties on Friday afternoon, October 28, 2005, at the IBM facility in Bedford, New Hampshire, Craig Smelser, IBM's new Vice President of Product Management for the IBM Storage Software unit, told Incipient that the payment had to be received in 2005, and that if Incipient did not pay the approximately $2 million testing subsidy prior to December 31, 2005, there would be "draconian cuts" for Incipient and the project in 2006, with the planned second release of the Product "cut." This comment was viewed by Incipient—and, on information and belief, intended by Mr. Smelser—as a direct threat to end the parties' arrangement unless Incipient tendered the $2 million testing subsidy early.

35.    Both during and after this meeting, however, IBM's statements and conduct regarding the testing subsidy led Incipient reasonably to believe that if IBM received the payment the project would continue through IVT testing to completion. For example, in an email dated December 14, 2005, John Cardwell, Program Manager for IBM Systems & Technology Group, told Incipient's Chief Executive Officer Ric Calvillo and Incipient's Chief Financial Officer Ed Durkin that, once the payment was received, it would be time to get the Product "ready for market and win with enhanced storage virtualization solutions."

36.    Because IBM threatened to terminate the project if Incipient did not make the payment, and because Incipient believed that payment would lead to completion of the project, Incipient paid IBM the approximately $2 million in two installments in December 2005 to keep the project alive.

37.    At the time of the IBM demand and the Incipient payments, IBM was aware that the competitor's product was behind schedule, lacked some of the previously announced potential features, and had not generated as much activity in the market as had been expected. On information and belief, IBM did not feel the same need to launch a competitive product as it had when it first entered into the Contract with Incipient. Also upon information and belief, when it demanded and received the $2 million testing subsidy from Incipient, IBM was looking into ways to terminate the Contract and to avoid paying the termination fee.

38.    Incipient would not have agreed to pay the testing subsidy before it was contractually required had Incipient known that IBM intended to terminate the Contract and avoid paying the termination fee.

### IBM Contrives "Cause" To Terminate the Contract

39.    After paying the testing subsidy, Incipient continued to work diligently on the project. Prior to the end of 2005, Incipient had already successfully passed the first (of three)

- 12 -

test phases with IBM, known as Functional Verification Testing (FVT). In early 2006, Incipient undertook tests in the second (IVT) test phase. Incipient also requested that IBM commence the third and final test phase, known as System Verification Testing (SVT), in parallel with completing the IVT phase, as IBM had done for its internally-developed DS 6000 and 8000 products, so as to expedite product time-to-market. IBM refused Incipient's request to commence the final SVT phase in parallel with completing the IVT phase, without explanation to Incipient.

40.     On information and belief, in late 2005 and early 2006, IBM sought to avoid its contractual financial commitment to the Product, largely because (i) the market for switch-based virtualization solutions appeared nascent at the end of 2005, (ii) the switch-based virtualization product being developed by IBM's primary competitor had been delayed in getting to market in 2005 and IBM no longer felt a significant threat from this planned competitive offering and (iii) the internal bias for IBM's own SVC product over Incipient's Product had influenced IBM's plans for the Product. At one meeting in late 2005, Mr. Smelser told Incipient that:

- He and the new executive management team for the IBM storage business unit were struggling with how the Incipient Product could be positioned in the market in a manner that would be viewed as complementary to the internally-developed IBM SVC product;

- IBM had done new market research during 2005 that indicated that the market for switch-based storage virtualization was then a small and slow-growth market, which was concerning to the new management team at IBM;

- He expected IBM would sell "8 units" of the Incipient product after release in 2006 and this was also very concerning to him and the new IBM management team;

- IBM's SVC product was the primary virtualization product of focus for IBM, and IBM would continue to "lead with SVC" to protect its multi-year investment in SVC; and

- IBM's new executive management also was struggling with how IBM would instruct its sales force on how and when to sell the Incipient product (instead of leading with the IBM SVC product) and that IBM SVC was IBM's top sales priority going forward.

41.     As Mr. Smelser also put it during another meeting with Incipient in January 2006,

SVC was IBM's "lead dog," which IBM did not want to jeopardize. In addition, in a three-way

meeting with Incipient and Hewlett Packard ("HP") on January 9, 2006, at an HP facility in

Littleton, Massachusetts, Mr. Smelser conveyed to the parties that IBM did not want to "validate

the switch-based virtualization paradigm" of its major competitor (which would occur were IBM

to launch the Incipient switch-based storage virtualization product), as this validation would

adversely affect the market positioning of the IBM "appliance-based" approach and hurt IBM's

multi-year investment in its internally-developed SVC product.

42.     While making comments about its declining business need for the Product, IBM

repeatedly demonstrated its desire to free itself of the termination fee. Beginning in late 2005

and continuing into early 2006, IBM demanded on several occasions that Incipient agree to

eliminate or to restructure the termination fee. For example, during negotiations regarding a

separate agreement between the parties in December 2005, IBM sought to condition any changes

to that agreement on elimination or reduction of the termination fee from the Contract. IBM

made additional efforts in early 2006 to convince Incipient to eliminate or to lower the

termination fee and threatened to terminate the Contract if Incipient did not agree to do so.

Incipient reasonably and justifiably refused to renegotiate the termination fee, which would have

left Incipient completely exposed and without remedy in the event IBM sought to terminate the

Contract based on factors that had nothing to do with the Product's quality or Incipient's

adherence to the Contract, including the precise factors that the parties had considered when

negotiating the termination fee. Moreover, on a phone call between Mr. Smelser of IBM and Mr.

Durkin of Incipient (with Mr. Smelser calling while traveling in China), Mr. Smelser conveyed

that he and the new storage executive management team of IBM viewed the Incipient contract as

- 14 -

"unique and onerous" and that IBM wanted a new contract devoid of any termination fee provisions that IBM could cancel at will, without penalty, based on the market demand for the product.

43.    In short, IBM made every effort to eliminate the multimillion-dollar termination fee because it no longer intended to complete development of the Product. However, because of its substantial financial investment in the project, Incipient refused to surrender the termination fee provision. Furthermore, when Incipient, which was continuing to devote substantial internal resources to developing the Product for IBM, asked about IBM's intentions, IBM continued to assure Incipient in meetings and other communications that IBM intended to continue development of the Product and to pay the termination fee if it elected to withdraw. For example, in mid-February 2006, Mr. Durkin of Incipient spoke with Mr. Cardwell of IBM regarding the project. Mr. Durkin expressed a concern that IBM was seeking to avoid its obligations under the Contract and was planning to terminate the Contract and to fabricate a claim that Incipient had breached. Mr. Cardwell represented to Mr. Durkin that, if IBM terminated the Contract, it would abide by its obligation to pay the termination fee, stating that IBM was "honorable" and "would do the right thing," or words to that effect.

44.    However, on information and belief, IBM already was devising a plan to terminate the Contract and to avoid paying the termination fee by alleging, improperly and without foundation, that the termination was "for cause." Indeed, within a month of the conversation between Messrs. Durkin and Cardwell, IBM claimed a right to terminate the Contract without having to pay the termination fee.

45.    On or about March 14, 2006, IBM sent a Notice of Intent to Terminate ("Notice"), attached hereto as Exhibit E, to Incipient's office in Massachusetts. IBM claimed in

USIDOCS 6593200v1

the Notice that it had cause to terminate the Contract, but the Notice was opaque as to the grounds for such cause. The Notice asserted, without elaboration, that Incipient was "unable to provide adequate assurances of its ability" to deliver the Product in accordance with the specifications of the Contract and the Project Schedule. The Notice did <u>not</u> claim that Incipient had actually breached the Contract, let alone done so materially. Nor did it specify with any detail how IBM claimed Incipient <u>might</u> breach the Contract. The Notice purported to provide Incipient with 30 days to cure unspecified breaches and to give IBM adequate assurances that Incipient would perform its obligations under the Contract. The Notice was ineffective to put Incipient on notice of any actual breach of the Contract by Incipient.

46.    In a letter dated April 5, 2006, attached hereto as Exhibit F, and on other occasions, Incipient informed IBM that Incipient had not materially breached the Contract and advised IBM that IBM's disengagement from its testing obligations constituted a breach of the Contract. Incipient expressly assured IBM that it would deliver the product on a timely basis. Incipient continued to work diligently on the project. Indeed, Incipient achieved successful results on IVT test cases by April 2006, which evidenced substantial progress on development and testing.

47.    On or about April 14, 2006, IBM unilaterally stayed the 30-day cure period that IBM asserted was running pursuant to the Notice. The stay expired by its terms on April 30, 2006. On May 1, 2006, during a telephone conference between IBM and Incipient, IBM notified Incipient that it considered the Contract terminated for cause and advised Incipient that IBM would be directing its employees to cease performing IBM's testing obligations promptly following the telephone conference. During the same telephone conference, IBM also directed Incipient to cause all Incipient personnel present in IBM's Tucson, Arizona testing facility to

- 16 -

vacate the premises immediately. Also on May 1, 2006, IBM confirmed in writing its position that it was purporting to terminate the Contract for cause.

48.    On May 9, 2006, Incipient sent a letter to IBM requesting payment of the termination fee and setting forth the calculations of the fee in reasonable detail, pursuant to section 15.5.6 of the SOW. A copy of Incipient's statement is attached hereto as Exhibit G. Incipient calculated the termination fee to be $20,744,200. The termination fee is based on a formula set forth in the Contract. The majority of the fee represents the amount Incipient expended in developing the Product, although Incipient's actual development costs exceed the amount for which the contractual formula provides reimbursement.

49.    The Contract provides that IBM "shall pay the Late Termination Fee to [Incipient] by wire transfer within sixty (60) days after receiving such statement from [Incipient]." SOW § 15.5.6. Because Incipient provided the statement to IBM on May 9, 2006, the termination fee became due on July 8, 2006.

50.    IBM failed to remit payment to Incipient when due. On July 10, 2006, Incipient notified IBM by letter that IBM's failure to pay the termination fee was a breach of the Contract. A copy of Incipient's letter is attached hereto as Exhibit H.

51.    To this day, IBM has not paid the termination fee to Incipient.

52.    Incipient did not materially breach the Contract. Incipient used commercially reasonable efforts, as required in the Contract, to meet all of its obligations under the Contract, including the obligation to meet the Project Schedule, which expressly provided that the milestone dates were targets rather than firm deadlines. Contrary to IBM's unfounded assertion, as of the time IBM purported to terminate the Contract, Incipient expected to deliver the Product to the specifications in the Contract and had so assured IBM. Delays in development were

US1DOCS 6593200v1

attributable to factors beyond Incipient's control, including IBM's own behavior. IBM unjustifiably refused to adjust the milestone dates. In addition, time was not of the essence to the Contract and failure to deliver the Product in strict accordance with the Project Schedule and PRD would not have constituted a material breach of the Contract.

53.     On information and belief, IBM terminated the Contract because it no longer had an interest in the Product due to a multitude of factors unrelated to Incipient including: the smaller-than-anticipated reaction in the market to the competitor's switch-based product; a desire by IBM to protect its SVC appliance-based product business and not create market positioning confusion or IBM sales force confusion by introducing a switch-based virtualization product; a desire by IBM not to validate the switch-based virtualization paradigm, which was the paradigm promoted by IBM's major competitor, as IBM was concerned that this validation would materially and adversely affect the success of its SVC product and result in customers waiting for the higher performance switch-based product that Incipient was developing, thus delaying new orders for IBM's SVC product; IBM financial constraints in its storage business unit; and a desire at IBM to fund development and testing of other internally-developed IBM storage products, including IBM's DS 6000 and 8000 array products, IBM's Hydra tape product, and IBM's SVC product (which competed with the Incipient Product) at the expense of the program with Incipient. Indeed, on information and belief, IBM Storage General Manager Andy Monshaw remarked during a speech in April 2006—after it was clear that the competitor's product had not created the anticipated demand—that switch-based virtualization was not a realistic option for consumers.

54.     The termination by IBM was not due to any purported material breach by Incipient. Rather, on information and belief, IBM sought to terminate the Contract because it

USIDOCS 6593200v1

had no further need for the Product it had commissioned from Incipient but wanted to avoid

paying the contractually required termination fee, which exceeded $20 million.

### IBM's Unjustified Termination Adversely Affects Incipient's Relationship With A Third Party Distribution Partner

55.     IBM's termination of the Contract was not only improper in itself; it also

adversely affected a separate relationship that Incipient had with Hewlett-Packard ("HP"), one of

IBM's major competitors.

56.     The Contract allowed Incipient to enter into collateral agreements with companies

besides IBM to promote the Product.

57.     Incipient entered into a written agreement with HP in Massachusetts on or about

October 20, 2005, pursuant to which Incipient would develop a modified version of the Product

for HP's sale and distribution without many of the customizations that IBM had desired.

58.     HP structured its agreement with Incipient so that HP could also use a modified

version of the Incipient Product to allow HP to also follow the principal competitor of IBM into

the market with a switch-based virtualization solution.

59.     IBM knew of the business relationship between Incipient and HP. IBM discussed

the Incipient/HP relationship with HP during a three-party meeting that IBM requested, which

was held in an HP facility in Littleton, Massachusetts, on January 9, 2006. This three-party

meeting was subject to the understanding and agreement that the three companies would openly

share information during this meeting as a group, but that after this meeting, each party was to be

bound by the non-disclosure and confidentiality agreements set forth in the applicable

agreements between IBM and Incipient, and HP and Incipient, and no private discussions

between IBM and HP were to occur unless Incipient was also present. IBM, HP and Incipient

representatives were present at the meeting. IBM was also aware that termination of the

Contract with Incipient likely would cause HP to reconsider its agreement with Incipient and possibly to terminate its relationship with Incipient regarding development of the Product. IBM also requested that HP agree to market IBM's SVC product, a request HP rejected.

60.    On information and belief, once IBM had decided that it was no longer planning to launch the Product, it did not want Incipient to market the Product through HP because it would lead to competition with IBM's SVC. On information and belief, IBM calculated that if it terminated the Contract without paying the termination fee, Incipient would be unable to finance the completion of the Product.

61.    Following IBM's breach of the Contract and refusal to perform its contractual obligations to test and market the Product, on information and belief, IBM made derogatory remarks to HP about Incipient and the quality of the Product, in violation of the confidentiality provisions of the Contract, and also made derogatory comments about IBM testing results to HP. These inappropriate statements led, in part, to HP informing Incipient in September 2006 that HP would not be willing to purchase the Product and would no longer perform under their agreement. HP's cancellation of the HP-Incipient agreement was the direct and foreseeable result of IBM's termination of the Contract and improper disclosures IBM made to HP about the program with Incipient.

## Incipient Successfully Completes And Releases The Product

62.    After IBM's termination of the Contract, Incipient faced challenges in continuing development of the Product. Certain customizations mandated by IBM had to be removed. Incipient also had to develop and execute its own testing program and procure expensive equipment, which, under the Contract, was to be IBM's obligation. Incipient also now needed to market and sell the Product, which was to have been IBM's role under the Contract. This task was a difficult one for a small company like Incipient, which lacked any sales force.

- 20 -

63.    Despite IBM's refusal to perform its testing and marketing obligations under the Contract and its unjustified claim in the termination letter that Incipient would be unable to deliver the Product, Incipient successfully developed and released the Product.

64.    Incipient displayed the Product at the Storage Decisions conference in New York City in September 2006.  The October 5, 2006 edition of *InfoWorld*, a well-known technology news publication, referred to the Incipient product as "one of the most significant releases in recent storage news."  The Product was also well-received in November 2006 at the Storage Virtualization Hands-On Lab at Storage Networking World Fall 2006 in Orlando, Florida, the nation's largest storage-technology conference, as well as winning recognition as "Best Storage Virtualization Product" from Network World in February 2007.  The quality and capabilities of the Product have validated by the third party switch vendor on which the Incipient software runs, which performed independent testing of the Product.  Incipient officially launched the Product for the general public on December 22, 2006 and subsequently has received orders from many end user customers.

65.    Incipient's ability to deliver a quality product in a timely manner further confirms IBM's lack of cause to terminate the Contract or to avoid paying the termination fee.

### COUNT I

### (Breach of Contract)

66.    Incipient realleges and incorporates by reference the allegations set forth in paragraphs 1 through 65.

67.    The Contract is a valid and binding contract between Incipient and IBM.  As a valid and binding detailed written agreement between two sophisticated companies, the Contract should be enforced according to its specific terms expressly stated therein.  In particular, the

termination fee provision should be enforced according to its terms because Incipient negotiated firmly to obtain a termination fee for precisely the type of situation which arose here.

68.    Incipient performed its obligations under the Contract.

69.    IBM has failed to perform its obligations under the Contract. Specifically, IBM has refused to pay the contractual termination fee despite having terminated the Contract without cause. The parties negotiated the termination fee with the knowledge that IBM might desire to terminate the Contract if the market did not respond to the competitor's product launch, if other internal IBM financial and personnel changes occurred resulting in IBM no longer wanting to continue to support the project with Incipient, or if unforeseen dynamics unrelated to Incipient occurred. When the new storage management team at IBM determined it had no urgent need for a switch-based product to respond to an announced product of IBM's primary competitor in the storage market segment, IBM sought a pretext to terminate the Contract without paying Incipient the substantial termination fee. IBM has purported to terminate the Contract without cause to do so. Because the termination was without cause, IBM is obligated to pay Incipient the termination fee.

70.    The termination fee was due on July 8, 2006, pursuant to Incipient's May 9, 2006, letter to IBM that requested the termination fee and set forth the calculations of the fee in reasonable detail.

71.    IBM also materially breached the Contract by ordering its personnel to cease performing its testing and development obligations under the Contract. On July 10, 2006, Incipient sent IBM a letter providing notice that IBM had materially breached the Contract and providing IBM 30 days to cure such breach. IBM has not cured its material breach

72.    IBM also materially breached the Contract by refusing to introduce and offer the Product in a manner similar to SVC.

73.    Because of IBM's failure to perform its obligations under the Contract, Incipient has suffered damages, including but not limited to, the loss of the termination fee due to it under the Contract.

74.    Incipient is entitled to recover at least $20,744,200 in damages from IBM for breach of the Contract.

## COUNT II

### (Breach of the Implied Duties of Good Faith and Fair Dealing)

75.    Incipient realleges and incorporates by reference the allegations set forth in paragraphs 1 through 74.

76.    IBM has violated its duties of good faith and fair dealing that are implied in every contract under New York law. IBM violated these duties by, among other things, preventing Incipient from completing its performance of the Contract, demanding with threats the approximately $2 million testing subsidy before it was due at a time when IBM knew it would not perform its obligations under the Contract, manufacturing an unjustified pretext to terminate the Contract without paying the required termination fee, making inappropriate and derogatory comments to HP in violation of existing non-disclosure agreements, and depriving Incipient of other benefits of the Contract.

77.    Because of IBM's failure to act in good faith and to deal fairly toward Incipient, Incipient has suffered damages, including but not limited to, the loss of the termination fee due to it under the Contract and the benefits that Incipient would have received upon completion of the project, as well as damages for the loss of the HP relationship.

78.     Incipient is entitled to recover at least $20,744,200 damages from IBM for breach of the duties of good faith and fair dealing.

**COUNT III**

(Unfair or Deceptive Trade Practices, Mass. G.L. ch. 93A, § 11)

79.     Incipient realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79.

80.     IBM engaged in unfair or deceptive trade practices toward Incipient, including but not limited to, negotiating with Incipient in bad faith, preventing Incipient from completing its performance of the Contract, demanding with threats that Incipient pay before it was due approximately $2 million to subsidize testing of the product, inducing Incipient to continue development of the Product when IBM did not intend either to complete its obligations or to pay the termination fee, contriving a pretext in an effort to avoid its contractual obligation to pay the termination fee, and intentionally acting to interfere with Incipient's business relationship with HP.

81.     IBM acted immorally, unethically, oppressively, and unscrupulously toward Incipient, violating the standards of the commercial marketplace.

82.     As a result of IBM's unfair or deceptive acts or practices toward Incipient, Incipient suffered losses, including but not limited to, the $20,744,200 termination fee that IBM refused to pay, the benefits that Incipient would have received upon completion of the project, and damages for the loss of the HP relationship.

83.     IBM knowingly or willfully engaged in the unfair or deceptive acts described.

84.     The actions and transactions constituting IBM's unfair or deceptive acts or practices occurred primarily and substantially within the Commonwealth of Massachusetts. Among other things, the parties' negotiations regarding the Contract and the termination fee

USIDOCS 6593200v1

occurred substantially in Massachusetts; IBM demanded the payment of the testing subsidy, which Incipient made from its offices in Massachusetts; IBM intended that Incipient perform its product-development work in Massachusetts, which Incipient did; IBM met with Incipient and HP in Massachusetts and took actions intended to affect the Massachusetts-based HP-Incipient agreement, and the financial consequences to Incipient of IBM's unfair or deceptive acts or practices occurred in Massachusetts.

85.    Incipient entitled to treble damages in the amount of at least $62,232,600.

## PRAYER FOR RELIEF

Incipient prays that a judgment be entered in favor of Incipient against IBM granting Incipient the following relief:

1.    A determination that IBM has breached the Contract, that IBM has violated its duties of good faith and fair dealing toward Incipient, that IBM is obligated to pay Incipient the termination fee as provided in the Contract, and that IBM knowingly and willfully engaged in unfair or deceptive acts or practices;

2.    An award of contract damages at least in the amount of the $20,744,200 termination fee as provided in the Contract;

3.    An award of treble damages for unfair or deceptive acts or practices in an amount to be determined at trial of at least $41,488,400 beyond the $20,744,200 minimum breach of contract damages.

4.    Costs and attorneys' fees, as provided by Mass. Gen. L. c. 93A;

5.    Prejudgment interest at 12% per annum, commencing on July 8, 2006; and

US1DOCS 6593200v1

# EXHIBIT A

. . .

## Licensed Works Agreement

**Agreement # 4904ST0166**

This Base Agreement ("Base Agreement"), effective upon execution by both parties, ("Effective Date") between International Business Machines Corporation (IBM) ("Buyer") and Incipient Inc. ("Supplier"), establishes the basis for a multinational procurement relationship under which Supplier will provide Buyer the Deliverables and Services described in SOWs issued under this Base Agreement. Deliverables and Services acquired by Buyer on or after the Effective Date will be covered by this Base Agreement. This Base Agreement will remain in effect until terminated.

**1.0  Definitions:**

**"Affiliates"** means entities that control, are controlled by, or are under common control with, a party to this Agreement.

**"Agreement"** means this Base Agreement and any relevant Statements of Work ("SOW"), Work Authorizations ("WA"), and other attachments or appendices specifically referenced in this Agreement.

**"Code"** means computer programming code, including both **"Object Code"** (computer programming code substantially in binary form that is directly executable by a computer after processing, but without compilation or assembly) and **"Source Code"** (computer programming code that may be displayed in a form readable and understandable by a programmer of ordinary skill, excluding Object Code).

**"Deliverables"** means items that Supplier prepares for or provides to Buyer as described in a SOW. Deliverables include Licensed Works and those Tools, if any, identified as such in the SOW.

**"Derivative Work"** means a work that is based on an underlying work and would be a copyright infringement if prepared without the authorization of the copyright owner of the underlying work.

**"Electronic Self-Help"** means a process where Supplier electronically disables, removes, or otherwise prevents the use of its software product without the Buyer's or Buyer's Customer's cooperation or consent. Electronic Self-Help could be done through electronic or other means (for example: remotely through "back doors" or hidden entrances in the software or through hidden shut-down commands in the software that can be activated by phone or in other ways).

**"Enhancements"** means changes or additions, other than Error Corrections, to the Licensed Work that Supplier may make available. Unless otherwise set forth in the SOW, if an Enhancement adds substantial value to the Licensed Work and is offered to customers for an additional charge it will be considered a **"Major Enhancement"**, and all other Enhancements, including those that support new releases of operating systems and devices, will be considered **"Basic Enhancements"**.

**"Error Corrections"** means revisions that correct errors and deficiencies (collectively referred to as "errors") in the Licensed Work.

**"Externals"** means any pictorial, graphic, audiovisual works, reports or data generated by execution of the Licensed Works Code pursuant to licenses granted hereunder, and any programming interfaces, languages or protocols to the extent implemented in the Licensed Work Code to enable interaction with other computer programs or end users, but not for use separate from the Licensed Works Code. Externals do not include the code that implements them.

**"Licensed Work"** is the specific material described in or that conforms to the Description of Licensed Work in the relevant SOW and/or WA and includes Code, associated documentation, Externals, Error Corrections, and Enhancements.

**"Personnel"** means agents, employees or subcontractors engaged or appointed by Buyer or Supplier.

**"Prices"** means the agreed upon payment and currency for Deliverables and Services, including all applicable fees, royalty payments, agreed upon reimbursables and Taxes, as specified in the relevant SOW and/or WA.

**"Products"** means an offering to customers or other users, whether or not branded by Buyer or its Affiliates that includes the Licensed Work or a Derivative Work of a Licensed Work.

**"Services"** means work that Supplier performs for Buyer as described in a SOW.

**"Statement of Work"** or **"SOW"** means any document that:

1. identifies itself as a statement of work;
2. is signed by both parties;
3. incorporates by reference the terms and conditions of this Base Agreement; and
4. describes the Deliverables and Services, including any requirements, specifications or schedules.

**"Subscription"** means a contract with an End User which provides such End User with support and/or software upgrades in exchange for a fee.

**"Tax(es)"** means any and all applicable taxes, charges, fees, levies or other assessments imposed or collected by any governmental entity worldwide or any political subdivision thereof and however designated or levied on sales of Deliverables or Services, or sales, use, transfer, goods and services or value added tax or any other duties or fees related to any payment made by Buyer to Supplier for Deliverables and/or Service provided by Supplier to Buyer under or pursuant to this Agreement.

**"Tools"** means software that is not commercially available, and its Externals, required for the development, maintenance or implementation of a software Deliverable.

**"Work Authorization"** or **"WA"** means Buyer's authorization in either electronic or tangible form for Supplier to conduct

Licensed Works Agreement

Agreement # 4904ST0166

transactions under this Agreement (i.e., a purchase order, bill of lading, or other Buyer designated document). A SOW is a WA only if designated as such in writing by Buyer

## 2.0 Statement of Work

### 2.1 Licensed Works

Supplier will deliver to Buyer:

1. one complete copy of the Licensed Work described in the relevant SOW and/or WA;
2. a completed Certificate of Originality in the form specified in the SOW with the Licensed Work and with each Enhancement to the Licensed Work;
3. complete copies of all Tools (if any are identified in the SOW), including updates to such Tools as soon as practicable; and
4. a complete list of all commercially available software required for the development, maintenance or implementation of a software Deliverable, including updates to the list as soon as practicable.

### 2.2 Enhancements and Error Corrections

Unless otherwise specified in the SOW, Supplier will also provide to Buyer, at no additional charge, Major Enhancements to the Licensed Work beginning when Buyer accepts the Licensed Work and continuing for the Major Enhancements Warranty Period identified in the SOW. After that period, unless otherwise specified in the SOW, Supplier will offer to Buyer within sixty (60) days of availability Major Enhancements to the Licensed Work that Supplier creates or authorizes others to create at terms no less favorable than those offered to Supplier's most favored customers. If Buyer accepts Supplier's offer, if any, the parties will amend the relevant SOW and/or WA to include such charges, terms and conditions, and the Major Enhancements will become part of the Licensed Work.

### 2.3 Work Authorizations

Supplier may accept WA's that conform to the terms and conditions of this Agreement.

## 3.0 Pricing

Supplier will provide Deliverables and Services to Buyer for the Prices. The Prices for Deliverables specified in a SOW and/or WA and accepted by Buyer plus the payment of applicable Taxes will be the only amounts due to Supplier from Buyer. The relevant SOW or WA shall contain Prices for each country receiving Deliverables and Services under this Agreement.

## 4.0 Taxes

Supplier's invoices shall state applicable Taxes, if any, that Supplier has a legal obligation to collect from Buyer and pay to a taxing authority. Such information is to be provided by tax jurisdiction and with a proper breakdown between taxable and non-taxable Deliverables and Services. Supplier shall remit such tax payments collected from Buyer to the appropriate jurisdiction. Supplier agrees to use commercially reasonable efforts to properly calculate any applicable Taxes at the time of invoice. Supplier and Buyer agree to cooperate to minimize any applicable Taxes imposed on Buyer, including reasonable notice and cooperation in connection with any audit. Any incremental Taxes that Supplier has a legal obligation to collect and pay to a taxing authority shall be Supplier's responsibility. If Buyer provides certification of an exemption from Tax or reduced rate of Tax imposed by an applicable taxing authority, then Supplier shall not invoice for nor pay over any such Tax unless and until the applicable taxing authority assesses such Tax, at which time Supplier shall invoice and Buyer shall pay any such Tax that is legally owed.

Buyer shall withhold taxes, if required by law to be withheld on payments made to Supplier hereunder, and shall be required to remit to Supplier only the net proceeds thereof. Buyer shall remit the taxes withheld to the appropriate government authority and agrees to provide Supplier in a timely manner with properly executed documentation or other information or receipts or certificates evidencing Buyer's payment of any such withholding tax. Supplier and Buyer agree to cooperate to minimize such withholding taxes.

Supplier will indemnify Buyer from any claims by any jurisdiction relating to Taxes paid by Buyer to Supplier; and for any penalties, fines, additions to tax or interest thereon imposed as a result of Supplier's failure to timely remit the Tax payment collected from Buyer to the appropriate taxing jurisdiction. Supplier also shall indemnify Buyer for any claims made by a taxing jurisdiction for penalties, fines, additions to tax and the amount of interest thereon imposed with respect to Supplier's failure to invoice Buyer for the correct amount of Tax.

Licensed Works Agreement

Agreement # 4904ST0166

5.0   Payments and Acceptance

*5.1    Acceptance*

Payment of royalties or invoices will not be deemed acceptance of Deliverables, but rather such Deliverables will be subject to inspection, test, acceptance or rejection in accordance with the acceptance or completion criteria as specified in the relevant SOW and/or WA. Buyer may, at its option, reject Deliverables that do not comply with the acceptance or completion criteria.

*5.2    Royalty Payments*

Royalties for Licensed Works will be specified in the relevant SOW and/or WA. Buyer may suspend payments to Supplier for a Licensed Work if Supplier does not provide a properly completed Certificate of Originality. Payment will resume upon Buyer's receipt of an acceptable Certificate.

*5.3    Royalty Calculations*

Royalties, if any, are paid against revenue recorded by Buyer for a royalty payment quarter. Payment will be made by the last day of the second calendar month following the royalty payment quarter. All payments will be made in U.S. dollars. Payments based on foreign revenue will be converted to U.S. dollars on a monthly basis at the rate of exchange published by Reuters Financial Service on approximately the same day each month. Terms for payment of any non-royalty payments will be specified in the relevant SOW and/or WA.

*5.4    Exceptions to Royalty Payment Obligations*

Buyer has no royalty obligation for:

(a) the Licensed Work or its Derivative Works (if Buyer is granted rights in Derivative Works in the SOW) used for:

1. Buyer's or Buyer Personnel's internal use;

2. development, maintenance or support activities conducted by Buyer or Buyer Personnel, or third parties under contract with Buyer;

3. marketing demonstrations, customer testing or trial periods (including early support, prerelease, encrypted or locked sampler distributions not resulting in a license for full productive use, or other similar programs), Product training or education; or

4. backup and archival purposes;

(b) a copy of any work station-based Product installed by a licensed end user on an alternate work station (e.g., home terminal or laptop), provided the end user may not use the Product on both work stations at the same time;

(c) the Licensed Work (or a functionally equivalent work) that becomes available generally from Supplier to third parties without a payment obligation;

(d) documentation provided with, contained in, or derived from the Licensed Work;

(e) Error Corrections, or Basic Enhancements, other than royalty obligations on Product and Subscription revenues as set forth in an applicable SOW;

(f) warranty replacement copies of the Product; and

(g) Externals.

*5.5    Outsourcing License*

In the event Buyer provides outsourcing services to licensees of a Product, Buyer will not owe Supplier a fee for access to or assignment of a license to such Product or for transfer of the applicable Product to a Buyer computer system which is of like configuration as the computer system for which the Product was licensed. The foregoing is subject to Buyer providing Supplier notice of such Product to be managed by Buyer and provided the Product will only be used on behalf of the licensee. Upon expiration or termination of the agreement to provide outsourcing services to the licensee, Buyer's right to use that copy of the Product will end.

*5.6    Invoicing*

Unless otherwise provided by local law without the possibility of contractual waiver or limitation, Supplier will submit invoices, corrected invoices, or other such claims for reimbursement, to Buyer within (1) year from the date of acceptance of Deliverables or the satisfactory completion of Services. Exceptions must be specifically authorized by Buyer.

6.0   Electronic Commerce

To the extent permitted by local law, the parties will conduct transactions using an electronic commerce approach under which the parties will electronically transmit and receive legally binding purchase and sale obligations ("Documents"); including electronic credit entries transmitted by Buyer to the Supplier account specified in the relevant SOW and/or WA.

Licensed Works Agreement

Agreement # 4904ST0166

The parties will enter into a separate agreement governing the transmission of such electronic transactions and associated responsibilities of the parties.

### 7.0  Warranties
#### 7.1    Ongoing Warranties
Supplier makes the following ongoing representations and warranties:

1. it has the right to enter into this Agreement and its performance of this Agreement will comply, at its own expense, with the terms of any contract, obligation including any between Supplier and its end-users; or any law, regulation or ordinance to which it is or becomes subject;
2. no claim, lien, or action exists or is threatened against Supplier that would interfere with Buyer's rights under this Agreement;
3. all authors have agreed not to assert their moral rights (personal rights associated with authorship of a work under applicable law) in the Deliverables, to the extent permitted by law;
4. Deliverables comply in all material respects with their specifications as set forth in the applicable SOW
5. Deliverables are safe for use consistent with their intended use;
6. Deliverables do not contain harmful code;
7. Services will be performed using reasonable care and skill and in accordance with the relevant SOW and/or WA;
8. it will not engage in Electronic Self-Help;
9. Deliverables and Services that generate or process, in any capacity, monetary data are euro ready such that when used in accordance with their associated documentation they are capable of correctly processing monetary data in the euro denomination and respecting the euro currency formatting conventions (including the euro sign);
10. will cooperate with Buyer's efforts to comply with all applicable export and import laws, regulations, orders, and policies (including, but not limited to, securing all necessary clearance requirements, export and import licenses and exemptions from, and making all proper filings with appropriate governmental bodies and/or disclosures relating to the release or transfer of technology and software to non U.S. nationals in the U.S., or outside the U.S., release or transfer of technology and software having U.S. content or derived from U.S.-origin software or technology);
11. it will not export, directly or indirectly, any technology, software or commodities of U.S. origin or having U.S. content provided by Buyer or their direct product to any of the countries or to nationals of those countries, wherever located, listed in U.S. Export Administration Regulations, as modified from time to time, unless authorized by appropriate government license or regulations;
12. it will not use, disclose, or transfer across borders any information that is processed for Buyer that may identify an individual (Personal Data), except to the extent necessary to perform under this Agreement; and
13. it will comply with all applicable data privacy laws and regulations, will implement and maintain appropriate technical and other protections for the Personal Data, will report any breaches of protection of Personal Data, and will cooperate fully with Buyer's requests for access to, correction of, and destruction of Personal Data in Supplier's possession.

**THE WARRANTIES IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS, EXPRESS OR IMPLIED, INCLUDING THOSE WARRANTIES OR CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT.**

#### 7.2    Warranty Redemption
Subject to Section 10.0 (Supplier Liability for Third Party Claims), if Deliverables or Services do not comply with the warranties in this Agreement, Supplier will repair or replace Deliverables or re-perform Services, during the warranty period defined in the SOW upon the terms and conditions of the applicable warranty set forth in the SOW.  If Supplier fails to do so, Buyer may repair or replace Deliverables or re-perform Services and Supplier will reimburse Buyer for actual and reasonable expenses up to an amount not to exceed the charges from Supplier to Buyer for the Products and/or Services that are the subject of the claim.  Buyer will use commercially reasonable efforts to mitigate the amount of such expenses.

### 8.0  Delivery
Deliverables or Services will be delivered as specified in the relevant SOW and/or WA.  If Supplier cannot comply with a delivery commitment, and such failure is not caused by Buyer's failure to perform its duties under the SOW, then Supplier will promptly notify Buyer of a revised delivery date and Buyer may:

1. cancel without charge Deliverables or Services not yet delivered; and
2. exercise all other remedies provided at law, in equity and in this Agreement.

### 9.0  Intellectual Property
#### 9.1    Licensed Works

# Licensed Works Agreement

Agreement # 4904ST0166

Supplier grants Buyer the rights in the Licensed Works as specified in the relevant SOW and/or WA. Subject to Supplier's ownership of the Licensed Work and Tools, Buyer will own any Derivative Works it creates to the extent, if any, Buyer has the right to create Derivative Works as set forth in an applicable the SOW.

### 9.2    Tools
Supplier will not include Tools in Deliverables unless they are listed in the relevant SOW. If identified in the SOW, Supplier grants Buyer a nonexclusive, worldwide, perpetual, irrevocable, paid-up, license to prepare and have prepared Derivative Works of Tools, and to use, have used, execute, reproduce, transmit, display and perform Tools or their Derivative Works.

### 9.3    Perfection of Copyrights
Upon request, Supplier will provide to Buyer a "Certificate of Originality" or equivalent documentation to verify authorship of Deliverables.

### 9.4    Names and Trademarks
Supplier grants Buyer a nonexclusive, worldwide, perpetual, irrevocable, paid-up license to use the names and trademarks of Supplier to the extent Supplier has caused such trademarks to appear on or within the Deliverables and such license is necessary for Buyer to fully exercise its other license rights to the Deliverables; provided, however that the foregoing does not authorize Buyer to independently apply Supplier's trademarks to such Deliverables or any other product or service.

### 9.5    Patents
Supplier grants to Buyer a nonexclusive, worldwide, perpetual, irrevocable, and paid-up license under any patents and patent applications licensable by Supplier to make, have made, use, have used, import, export, sell, and otherwise transfer the Deliverables and use the Services to the extent authorized in this Agreement.

## 10.0  Supplier Liability for Third Party Claims
### 10.1    General Indemnification
Supplier will defend, hold harmless and indemnify, including legal fees, Buyer and Buyer Personnel against third party claims that arise or are alleged to have arisen as a result of negligent or wrongful acts or omissions of Supplier or Supplier Personnel or breach by Supplier of any term of this Agreement; provided that in the case of the warranties set forth in Sections 7.1(4) and (6), Supplier's sole and exclusive liability, and Buyer's sole and exclusive remedies, for such breach of warranties shall be as set forth in Section 7.2 (Warranty Redemption) and any additional warranty remedies provided by Buyer to its customers shall be solely Buyer's obligation.

### 10.2    Intellectual Property Indemnification
Supplier will defend, or at Buyer's option cooperate in the defense of, hold harmless and indemnify, including legal fees, Buyer and Buyer Personnel from third party claims that Supplier's Deliverables infringe the intellectual property rights of a third party. If such a claim is or is likely to be made, Supplier will, at its own expense, exercise the first of the following remedies that is practicable:
1. obtain for Buyer the right to continue to use, sell and license the Deliverables consistent with this Agreement;
2. modify Deliverables so they are non-infringing and in compliance with this Agreement;
3. replace the Deliverables, or other affected Deliverables or Services, with non-infringing ones that comply with this Agreement; or
4. require the return of infringing Deliverables and refund any amount paid.
Buyer will give Supplier prompt notice of third party claims against Buyer, and cooperate in the investigation, settlement and defense of such claims.

### 10.3    Exceptions to Indemnification
Supplier will have no obligation to indemnify Buyer or Buyer Personnel for claims that Supplier's Deliverables or Services infringe the intellectual property rights of a third party to the extent such claims arise as a result of Supplier's implementation of a Buyer originated design and such infringement or claim would have been avoided in the absence of such implementation, or Buyer's modification of the Deliverables and such infringement or claim would have been avoided in the absence of such modification.

### 10.4    Control of Defense

## Licensed Works Agreement

Agreement # 4904ST0166

Supplier's obligation of defense set forth in Sections 10.1 and 10.2 shall be conditioned upon Buyer promptly notifying Supplier in writing of the claim, and allowing Supplier to control, and cooperate with Supplier in, the defense and any related settlement negotiations.

### 11.0  Limitation of Liability between Supplier and Buyer

Circumstances may arise where because of a default on Supplier's part or other liability, Buyer is entitled to recover damages from Supplier.  In each such instance, regardless of the basis on which Buyer is entitled to recover damages from Supplier (including fundamental breach, negligence, misrepresentation, or other contract or tort claim), Supplier shall be liable for no more than :

(a) payments referred to in Section 10 (Supplier Liability for Third Party Claims) above;

(b) damages for bodily injury (including death) and damage to real and tangible personal property;

(c) the amount of any actual direct damages up to the charges from Supplier to Buyer for any identifiable, specific Products and/or Services that are the subject of the claim; and

(d) for all claims that are not associated with identifiable, specific Products and Services, in the aggregate, Ten Million Dollars ($10,000,000)..

Except for violations of intellectual property rights (e.g., uses of Licensed Works or other intellectual property outside the scope of licenses granted hereunder that would constitute an infringement of such rights in the absence of a license) or breaches of confidentiality, under no circumstances will either party be liable to the other for any of the following even if informed of their possibility:

(a) loss of or damage to data;

(b) special, incidental or indirect damages or for any economic consequential damages; or

(c) lost profits, business, revenue, goodwill or anticipated savings.

Nothing in this Section 11.0 shall limit either party's obligations to pay the other party amounts as specified in Section 15 of the SOW.

### 12.0 Supplier and Supplier Personnel

Supplier is an independent contractor and this Agreement does not create an agency relationship between Buyer and Supplier or Buyer and Supplier Personnel. Buyer assumes no liability or responsibility for Supplier Personnel. Supplier will:
1. ensure it and Supplier Personnel are in compliance with all laws, regulations, ordinances, and licensing requirements;
2. be responsible for the supervision, control, compensation, withholdings, health and safety of Supplier Personnel;
3. inform Buyer if Supplier is aware that a former employee of Buyer will be assigned to provide Services under this Agreement, such assignment subject to Buyer approval;
4. ensure Supplier Personnel performing Services on Buyer's premises comply with the On Premises Guidelines and upon request, provide Buyer, for export evaluation purposes, the country of citizenship and permanent residence and immigration status of those persons. Buyer retains the right to refuse to accept persons made available by Supplier for export control reasons; and
5. not discriminate against any employees, applicants for employment, or any entity engaged in its procurement practices because of race, color, religion, sex, age, national origin, or any other legally protected status.

### 13.0 Insurance

Supplier will maintain at its expense:
1. commercial general or public liability insurance with a minimum limit per occurrence or accident of 1,000,000 USD (or local currency equivalent);
2. workers' compensation or employer's liability insurance as required by local law, such policies waiving any subrogation rights against Buyer; and

## Licensed Works Agreement

Agreement # 4904ST0166

3  automobile liability insurance as required by local statute but not less than 1,000,000 USD (or local currency equivalent)
if a vehicle will be used in the performance of this Agreement.
Insurance required under clauses (1) and (3) will name Buyer as an additional insured with respect to Buyer's insurable
interest, will be primary or non-contributory regarding insured damages or expenses, and will be purchased from insurers
with an AM Best Rating of B+ or better and a financial class rating of 11 or better.

**14.0  Termination**

**14.1   Termination of this Base Agreement**
Either party may terminate this Base Agreement, without any cancellation charge, for a material breach of this Agreement by
the other party or if the other party becomes insolvent or files or has filed against it a petition in bankruptcy ("Cause"), to the
extent permitted by law. Such termination will be effective at the end of a thirty (30) day written notice period if the Cause
remains uncured after expiration of any applicable cure period. Either party may terminate this Base Agreement without
Cause when there are no outstanding SOWs or WAs.

**14.2   Termination of a SOW or WA**
Buyer may, upon written notice to Supplier, terminate a SOW or WA:
1. with Cause effective immediately upon expiration of any applicable cure period if such Cause has not been cured; or
2. without Cause (subject to any limitations on the right to terminate without cause set forth in the applicable SOW).
Upon termination, in accordance with Buyer's written direction, Supplier will immediately:
1. cease work;
2. prepare and submit to Buyer an itemization of all completed and partially completed Deliverables and Services;
3. if required in the SOW, deliver to Buyer Deliverables satisfactorily completed up to the date of termination at the agreed
upon Prices in the relevant SOW and/or WA; and
4. if required in the SOW, deliver upon request any work in process. In the event Buyer terminates without Cause, and
subject to any limitations on such obligation set forth in the SOW, Buyer will compensate Supplier for the actual and
reasonable expenses incurred by Supplier for work in process up to and including the date of termination, provided such
expenses do not exceed the Prices.

**14.3   Effect of Termination**
All end user licenses granted to Buyer's customers pursuant this Agreement shall survive expiration or termination of this
Agreement for any reason.

**15.0  General**

**15.1   Amendments**
This Agreement may only be amended by a writing specifically referencing this Agreement which has been signed by
authorized representatives of the parties.

**15.2   Assignment**
Neither party will assign their rights or delegate or subcontract their duties under this Agreement to third parties or Affiliates
without the prior written consent of the other party, such consent not to be withheld unreasonably, except that either party
may assign this Agreement in conjunction with the sale of a substantial part of its business utilizing this Agreement. Any
unauthorized assignment of this Agreement is void.

**15.3   Choice of Law and Forum; Waiver of Jury Trial; Limitation of Action**
This Agreement and the performance of transactions under this Agreement will be governed by the laws of the State of New
York applicable to contracts executed in and performed entirely within that State. The United Nations Convention on
Contracts for the International Sale of Goods does not apply. The parties expressly waive any right to a jury trial regarding
disputes related to this Agreement. Unless otherwise provided by local law without the possibility of contractual waiver or
limitation, any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years
from the date on which the cause of action arose.

**15.4   Communications**
All communications between the parties regarding this Agreement will be conducted through the parties' representatives as
specified in the relevant SOW and/or WA. All notices required in writing under this Agreement will be made to the
appropriate contact(s) listed in the relevant SOW and/or WA and will be effective upon actual receipt. Notices may be

Licensed Works Agreement

Agreement # 4904STO166

transmitted electronically, by registered or certified mail, or courier. All notices, with the exception of legal notices, may also be provided by facsimile.

*15.5   Counterparts*
This Agreement may be signed in one or more counterparts, each of which will be deemed to be an original and all of which, when taken together will constitute the same agreement. Any copy of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

*15.6   Exchange of Information*
All information exchanged is non confidential. If either party requires the exchange of confidential information, it will be made under a separate signed confidentiality agreement between the parties. The parties will not publicize the terms of this Agreement, or the relationship, in any advertising, marketing or promotional materials without prior written consent of the other party except as may be required by law, provided the party publicizing obtains any confidentiality treatment available. Supplier will use information regarding this Agreement only in the performance of this Agreement. For any business personal information relating to Supplier Personnel that Supplier provides to Buyer, Supplier has obtained the agreement of the Supplier Personnel to release the information to Buyer and to allow Buyer to use such information in connection with this Agreement.

*15.7   Freedom of Action*
This Agreement is nonexclusive and either party may design, develop, manufacture, acquire or market competitive products or services. Buyer will independently establish prices for resale of Deliverables and Services and is not obligated to announce or market any Products or Services and does not guarantee the success of its marketing efforts, if any.

*15.8   Force Majeure*
Neither party will be in default nor liable for any delay or failure to comply with this Agreement due to any act beyond the control of the affected party, excluding labor disputes, provided such party immediately notifies the other.

*15.9   Prior Communications and Order of Precedence*
This Agreement replaces any prior oral or written agreements or other communication between the parties with respect to the subject matter of this Agreement, excluding any confidential disclosure agreements. In the event of any conflict in these documents, the order of precedence will be (from highest to lowest):
1. the quantity, payment and delivery terms of the relevant WA;
2. the relevant SOW;
3. this Base Agreement; and
4. the remaining terms of the relevant WA.

*15.10   Record Keeping and Audit Rights*
Supplier will maintain (and provide to Buyer upon request) relevant business and accounting records to support invoices under this Agreement and proof of required permits and professional licenses, for a period of time as required by local law, but not for less than three (3) years following completion or termination of the relevant SOW and/or WA. All accounting records will be maintained in accordance with generally accepted accounting principles.

*15.11   Severability*
If any term in this Agreement is found by competent judicial authority to be unenforceable in any respect, the validity of the remainder of this Agreement will be unaffected, provided that such unenforceability does not materially affect the parties' rights under this Agreement.

*15.12   Survival*
The provisions set forth in the following Sections and Subsections of this Base Agreement will survive after termination or expiration of this Agreement and will remain in effect until fulfilled: "Taxes", "Ongoing Warranties", "Supplier Liability for Third Party Claims", "Limitation of Liability between Supplier and Buyer", "Record Keeping and Audit Rights", "Choice of Law and Forum; Waiver of Jury Trial; Limitation of Action", "Exchange of Information", and "Prior Communications and Order of Precedence".

*15.13   Waiver*

Licensed Works Agreement

Agreement # 4904ST0166

An effective waiver under this Agreement must be in writing signed by the party waiving its right. A waiver by either party of any instance of the other party's noncompliance with any obligation or responsibility under this Agreement will not be deemed a waiver of subsequent instances.

*15.14  Supply Chain Security*
Supplier will use commercially reasonable efforts to implement and maintain security measures, including periodic security assurance testing, that safeguard its internet and (as applicable) intranet systems and networks in order to detect and prevent disruption of deliverables and services to IBM and unauthorized access to sensitive IBM personal and/or business data. Upon request, Supplier will review such measures with IBM.

**ACCEPTED AND AGREED TO:**
International Business Machines Corporation
By: _Michael Casey_  10/15/04
Buyer Signature                     Date
Michael C. Casey
Printed Name
Contract Manager - Custom Software Procurement
Title & Organization

Buyer Address:
555 Bailey Road
San Jose, CA  95141
USA

**ACCEPTED AND AGREED TO:**
Incipient Inc.
By _____  10/12/04
Supplier Signature              Date
Ric Calvillo Jr.
Printed Name
CEO Incipient
Title & Organization

Supplier Address:
230 Third Avenue
Waltham, MA  02451
USA